# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RONALD W. WOLFE,

        Petitioner,

     v.                                     Case No. 05-C-85

GREG GRAMS, Warden,

        Respondent.

## DECISION AND ORDER ON FEDERAL HABEAS CORPUS PETITION

### I. PROCEDURAL BACKGROUND

On January 25, 2005, the petitioner, Ronald W. Wolfe ("Wolfe"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and a brief in support of his petition. After reviewing Wolfe's petition, the Honorable Thomas J. Curran, to whom this case was previously assigned, ordered the respondent, Greg Grams ("Grams"), to file an answer. On February 18, 2005, the respondent filed his answer. In his answer, the respondent alleged that some of Wolfe's claims had been procedurally defaulted. Thus, on February 24, 2005, Judge Curran ordered the parties to brief the procedural default issue. Thereafter, on May 31, 2006, Judge Curran issued a decision and order finding that Wolfe had withdrawn his claim that his trial counsel was ineffective because he failed to object to hearsay evidence. Judge Curran also found that Wolfe had procedurally defaulted the following claims: (1) that his trial counsel was ineffective because he waived Wolfe's confrontation rights; and (2) that his trial counsel was ineffective because he failed to object to the "uncharged jewelry allegation." Consequently, Judge Curran ordered those two claims dismissed. On June 12,

2006, this case was reassigned to this court based on the parties' consent to proceed before a magistrate judge. On June 15, 2006, Wolfe filed a motion for reconsideration of Judge Curran's May 31, 2006 Decision and Order dismissing two of Wolfe's claims as procedurally defaulted. On July 26, 2006, this court denied Wolfe's motion for reconsideration. Thereafter, in accordance with the briefing schedule set forth in the July 26th Order, the parties filed their briefs setting forth their respective positions on the petitioner's remaining claims.

Wolfe's federal habeas petition challenges his conviction, following a jury trial in the Waukesha County Circuit Court, of first-degree intentional homicide with the use of a dangerous weapon, contrary to Wis. Stat. §§ 940.01 and 939.63(1)(a)2; theft, contrary to Wis. Stat. § 943.30(1)(a); and bail jumping, contrary to Wis. Stat. § 946.49(1)(b). On May 14, 2001, the Waukesha County Circuit Court sentenced Wolfe to life imprisonment without the possibility of parole or extended supervision.

On May 21, 2002, Wolfe filed with the circuit court a motion for postconviction relief. In that motion, Wolfe claimed that his trial counsel had been ineffective for several reasons. Following a hearing, the trial court denied Wolfe's motion. On November 5, 2003, the Wisconsin Court of Appeals issued its decision affirming the circuit court's order denying relief on the postconviction motion and the judgment of conviction. On January 23, 2004, the Wisconsin Supreme Court denied Wolfe's petition for review. As previously stated, Wolfe filed this federal habeas petition on January 25, 2005.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") significantly constrains any federal court's review of a state court conviction. *Searcy v. Jaimet*, 332 F.3d 1081,

2

1087 (7th Cir. 2003). Federal courts may issue a writ of habeas corpus for a person in custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Furthermore, federal courts may not grant habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision results in an "unreasonable application" of clearly established federal law when the state court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407; *see also Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). Moreover, "[a] rule is 'clearly established' only if it is compelled by existing Supreme Court precedent." *Henry v. Page*, 223 F.3d 477, 480 (7th Cir. 2000).

The "unreasonable application" prong of AEDPA means the state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757,

3

762 (7th Cir. 2002): *see also Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) ("We have held that under this criterion, habeas relief should not be granted if the state court decision can be said to be one of several equally-plausible outcomes."). In the habeas context, an "unreasonable" application is more than simply an "incorrect" application, so "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Instead, "the state-court decision must be both incorrect and unreasonable." *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005).

Issues of fact found by a state court are presumed to be correct unless the petitioner rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Parke*, 133 F.3d 971, 973 (7th Cir. 1997).

## III. DISCUSSION

The core facts of the case against Wolfe are found in the court of appeals' decision.

Ronald Carter was found stabbed to death in his home on September 18, 2000. Wolfe was linked to the death by the discovery of a bloody imprint of his hand found in Carter's kitchen sink, his fingerprint on a soda bottle near Carter's body, two bloody footprints at the home with a pattern consistent with the soles of his shoes, and his jacket stained with Carter's blood found in a field near Carter's home. Weeks before his death, Carter had bailed Wolfe out of jail and Wolfe had stayed at Carter's home off and on. Just days before his death, by a letter dated September 13, 2000, Carter asked three circuit court judges to revoke Wolfe's bond because Wolfe had used cocaine and Carter was afraid of him.

Wolfe's theory of defense was self-defense. He told police that he had informed Carter that they could not have a sexual relationship and later Carter came at him with a steak knife proclaiming that "[i]f I can't have you, no one else can." Wolfe said he wrestled the knife from Carter and stabbed him in the neck several times. Although bleeding profusely, Carter assured Wolfe he would be okay. Wolfe helped Carter to the bathroom and later the family room where Carter sat in a chair with a towel applied to the wounds. Wolfe then passed out and when he awoke

twelve hours later he discovered that Carter was dead. He grabbed Carter's wallet or credit cards and fled. Wolfe's theory of defense portrayed Carter as a jealous, drunk, suicidal, raging man. Wolfe also presented evidence that Carter had helped another man obtain release on bail and that when the man refused to engage in sexual contact, Carter came at the man with a knife saying, "[I]f I can't have you no one is going to have you."

(Resp's Ans, Ex. G, ¶¶ 2-3.)

Wolfe sets forth four grounds for his claimed entitlement to habeas corpus relief. The first three of them fall under the umbrella of ineffective assistance of counsel. Specifically, Wolfe claims that his trial counsel was ineffective for (1) failing to consult with him, schedule phone conferences or provide him with discovery information; (2) failing to present testimony from Dr. Eugene Braaksma; and (3) failing to present to the jury certain letters written by Carter. Finally, Wolfe claims that the trial court erred by not conducting a waiver inquiry when Wolfe's attorney retracted his objection to the admission of a letter written by Carter expressing his fear of Wolfe.

## A. Claims Predicated on Ineffective Assistance of Counsel

Defendants in criminal cases have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 , 686 (1984). In order to establish an ineffective assistance of counsel claim, a defendant must demonstrate both that counsel's assistance was ineffective, and that the ineffective assistance prejudiced the defendant. A defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

5

The burden on a habeas petitioner to show that counsel's assistance was ineffective is not easily satisfied. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Furthermore, a habeas court need not address the two prongs of *Strickland* in any particular order or even address both if the defendant makes an inadequate showing as to one. In this latter regard the Supreme Court in *Strickland* stated:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697.

In deciding Wolfe's ineffective assistance claims the Wisconsin Court of Appeals applied the two pronged test of *Strickland*. That is to say, the court of appeals identified the correct governing legal rule from the Supreme Court. Thus, the only question for this court to decide is whether the state court unreasonably applied *Strickland* to the facts in Wolfe's case.

As stated above, Wolfe's first claim of ineffectiveness assistance of counsel is grounded on the allegation that Wolfe's counsel failed to consult with Wolfe, failed to schedule phone conferences, and failed to provide Wolfe with discovery information. In addressing this issue the court of appeals stated as follows.

6

Wolfe first argues that trial counsel was ineffective because counsel only visited Wolfe in jail for a total of forty-five minutes, that the visits all happened before counsel received discovery material, and that counsel failed to schedule a telephone conference prior to trial. Counsel disputed Wolfe's quantitative assessment of jail visitation and billing records and testified that he spent far more than forty-five minutes with Wolfe. However, we need not concern ourselves with the amount of time spent because whether it was adequate or not must be assessed on a case-by-case basis. The quantity of time cannot be objectively mandated. We first consider whether Wolfe has demonstrated that he was prejudiced by inadequate consultation time.

The test for prejudice is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. We will reverse only if our confidence in the outcome is so undermined that the conviction is fundamentally unfair or unreliable. *State v. McMahon*, 186 Wis.2d 68, 80, 519 N.W.2d 621 (Ct. App. 1994).

Like an allegation that counsel has failed to investigate, Wolfe must indicate what further consultation with counsel would have revealed or how it would have changed the course of the defense. *See State v. Leighton*, 2000 WI App 156, ¶ 38, 237 Wis. 2d 709, 616 N.W.2d 126. "A criminal defendant who claims ineffective assistance of counsel cannot ask the reviewing court to speculate whether counsel's deficient performance resulted in prejudice to the defendant's defense. The defendant must affirmatively prove prejudice." *State v. Wirts*, 176 Wis. 2d 174, 187, 500 N.W. 2d 317 (Ct. App. 1993). Wolfe has not demonstrated one piece of information that he would have imparted to counsel during more frequent or confidential consultations that would have altered the outcome of the trial. There is no suggestion that trial counsel was uninformed about Wolfe's version of the offense or other circumstances bearing on relevant issues at trial. We conclude that Wolfe was not prejudiced by alleged inadequate consultation time.

(Resp's Ans, Ex. G, ¶¶ 5-7.) This court cannot say that the court of appeals' finding that Wolfe had failed to show how he was prejudiced by inadequate consultation time with his trial counsel was an unreasonable application of *Strickland*. To be sure, even in the briefs that he filed with this court Wolfe, at best, merely asserts as a general matter that his trial counsel did not meet and consult with him for an adequate period of time. But, he does not set forth with any specificity how, but for the

7

allegedly inadequate time that he spent with his trial counsel prior to trial, "the result of the proceeding would have been different." *Strickland*, 466 U.S. 669. By way of example, in his opening brief Wolfe asserts as follows:

> The lack of consultation in the case at bar, taken in the context that counsel also refused to share any of the discovery with his client, in spite of petitioner's requests, that is deficient performance. At no time prior to trial did petitioner have the opportunity of going over the evidence and allegations against him, or have the ability to advise counsel of the truthfulness of any allegations against him. Petitioner was prohibited from informing counsel of his complete knowledge of the turbulent and violent character, or past acts of Mr. Carter . . . that is deficient performance. Counsel had a duty to investigate the relationship between petitioner and Mr. Carter. . . . In this case petitioner learned of the evidence against him, including witness statements, during trial. That is deficient performance.

(Pet'r's Br. at 18-19.) To be clear, assuming for the sake of discussion that the allegations set forth above were true, such inattention by a lawyer towards his client would not be countenanced by this court. Indeed, such inattention might very well amount to "deficient performance." But that does not therefore mean that a defendant who is the victim of such alleged inattention would necessarily be entitled to federal habeas corpus relief under *Strickland*. To reiterate, in addition to a showing of ineffective assistance (i.e., deficient performance), *Strickland* also requires a showing that the defendant was prejudiced by such ineffective assistance. And this is where Wolfe's claim of ineffective assistance (at least in so far as it is predicated on the inadequate consultation) falls short. Wolfe did not present to the state court (and has not presented to this court) precisely why there is a reasonable probability that the result of his trial would have been different if his trial counsel had spent more time consulting with him in jail prior to trial. Such being the case, to the extent that Wolfe's habeas corpus petition is predicated on the claim that his trial counsel was ineffective for

8

failing to consult with him, schedule phone conferences or provide him with discovery information, Wolfe's petition will be denied.

Wolfe's second claim of ineffective assistance of counsel is grounded on the allegation that his lawyer failed to present testimony from Dr. Eugene Braaksma. Specifically, Wolfe argues that his trial counsel was ineffective for failing to "[e]licit from Dr. Braaksma any information about petitioner's complete diagnosis, [in] particular that Mr. Wolfe suffered from 'a significant mental illness . . . which are affecting his ability to function.' A delusional disorder and personality disorder of paranoia." (Pet'r's Br. at 25.) Relatedly, Wolfe argues that trial counsel should have moved the circuit court to modify the self-defense instruction to require the jury to address whether Wolfe believed his actions were reasonable, as opposed to whether a reasonable person would have believed his actions were reasonable. (Pet'r's Br. at 25-26.) By giving the jury such an instruction, the jury could have had the option of deciding whether Wolfe was guilty of second-degree intentional homicide, rather than first-degree intentional homicide.

The court of appeals addressed Wolfe's argument on this point in the following fashion.

> Wolfe contends that trial counsel failed to elicit from the defense expert that Wolfe suffers from depression and a delusional disorder. This alleged deficiency was a reasonable strategy decision. We do not second-guess counsel's choice of strategy. *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). Rather, we examine whether counsel's strategic choices are deliberate and based on rationality founded on the facts and applicable law. *Id*. at 502-03.

> Wolfe contends that if the defense expert had testified about his diagnosis of Wolfe's mental disorders, the jury would have been charged to assess the reasonableness of his self-defense claim in light of a person with his particular mental illness. Counsel indicated that he did not elicit such diagnosis as it would have detracted from the self-defense theory. He explained that if the jury heard that Wolfe had such disorders or was high on cocaine or drunk, it would give an alternative reason for Wolfe's attack. Such information could undermine Wolfe's theory of

9

defense that he merely responded to Carter's attack. Counsel is not required to offer evidence which contradicts that theory of defense. *Hubanks*, 173 Wis. 2d at 28.

Additionally, such evidence would not have required an alteration of the second-degree intentional homicide instruction to incorporate a subjective, actual belief as to an unlawful interference and the amount of force necessary to prevent or terminate it. At the time of trial, *State v. Camacho*, 176 Wis.2d 860, 865, 870-72, 501 N.W.2d 380 (1993), reflected the state of the law that first-degree homicide is not mitigated to imperfect self-defense homicide (second-degree) unless the defendant had a reasonable belief that he or she was preventing or terminating an unlawful interference, even if the defendant actually believed so. The subjective belief was not found applicable to second-degree homicide until the decision in *State v. Head*, 2002 WI 99, ¶¶ 91, 103-104, 255 Wis. 2d 194, 648 N.W.2d 413, modifying *Camacho* and decided after Wolfe's trial. Counsel's strategy decision is not unreasonable when based on the present state of the law. See *McMahon*, 186 Wis. 2d at 84-85 (no ineffective assistance of counsel where the law is murky because ineffective assistance of counsel cases should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue).

(Resp's Ans, Ex. G, ¶¶ 8-10.) In my opinion, the court of appeals' decision was not an unreasonable application of *Strickland*.

The petitioner claims that if his trial counsel had brought to the jury's attention Dr. Braaksma's diagnosis that Wolfe was suffering from delusional disorder and paranoia, such could have provided a basis for the jury to find him guilty of second-degree intentional homicide. By failing to do so, counsel was ineffective. This argument, however, is predicated on the proposition that, had his counsel introduced such testimony, the jury would have been instructed in accordance with the holding in *State v. Head*, 255 Wis. 2d 194, 648 N.W.2d 413 (2002).

In *Head*, the Wisconsin Supreme Court held, among other things, that a defendant seeking a jury instruction on unnecessary defensive force (imperfect self-defense) to a charge of first-degree intentional homicide is *not* required to satisfy an objective threshold showing that he was acting under a reasonable belief that he was in imminent danger of death or great bodily harm or that the

10

force he used was necessary to defend himself. Rather, the defendant must show some evidence that he *actually* believed that he was in imminent danger of death or great bodily harm and actually believed that the force he used was necessary to defend himself. And, a defendant is entitled to an instruction on unnecessary defensive force when the trial evidence places this mitigation defense in issue. *Head*, 255 Wis. 2d at 207, 648 N.W.2d at 419.

The Court's decision in *Head* significantly modified the law in Wisconsin. Previously, in *State v. Camacho*, 176 Wis. 2d 860, 501 N.W. 2d 380 (1993), the Wisconsin Supreme Court determined that "a person is privileged to act in self-defense [including imperfect self-defense] only if that person reasonably believes that he is preventing or terminating an unlawful interference with his person." 176 Wis. 2d at 872; 501 N.W.2d at 384. In *Head,* the Court stated:

> Based on the plain language of Wis. Stat. § 940.05(2), supported by the legislative history and articulated public policy behind the statute, we conclude that when imperfect self-defense is placed in issue by the trial evidence, the state has the burden to prove that the person had no actual belief that she was in imminent danger of death or great bodily harm, or no actual belief that the amount of force she used was necessary to prevent or terminate this interference. If the jury concludes that the person had an actual but unreasonable belief that she was in imminent danger of death or great bodily harm, the person is not guilty of first-degree intentional homicide but should be found guilty of second-degree intentional homicide.

> In light of this analysis, we must modify *Camacho* to the extent that it states that Wis. Stat. § 940.01(2)(b) contains an objective threshold element requiring a defendant to have a *reasonable* belief that she was preventing or terminating an unlawful interference with her person in order to raise the issue of unnecessary defensive force (imperfect self-defense).

255 Wis.2d at 244; 501 N.W.2d at 437.

Unfortunately for Wolfe, however, it was not until July 11, 2002, that the Wisconsin Supreme Court issued the *Head* decision. By that time, Wolfe had been tried, convicted and sentenced (having been sentenced on May 14, 2001). Wolfe's trial counsel can hardly be deemed to have been

11

constitutionally ineffective for following the law as it was on the books at the time of Wolfe's trial. And he can hardly be deemed to have been constitutionally ineffective for failing to predict that the Wisconsin Supreme Court would modify the law as it had been previously set forth in *Camacho*.

Indeed, Wolfe has not cited any United States Supreme Court case that holds trial counsel to have been constitutionally ineffective for following the law as it was at the time of a defendant's trial and for failing to predict that a state's highest court would in the future modify that particular law. To the contrary, in *Smith v. Murray*, 477 U.S. 527 (1986) the Supreme Court considered whether counsel's declining to pursue a claim "various forms of [which] . . . had been percolating in the lower courts for years" constituted ineffective assistance of counsel so as to excuse the habeas petitioner's procedural default in failing to raise the claim in the state courts. 477 U.S. at 537. The Court held that it did not. In doing so the Court observed that "it is simply not open to argument that the legal basis of the claim petitioner now presses on federal habeas corpus was unavailable to counsel at the time of the direct appeal." *Id*. The Court stated:

> It will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding or will underestimate the likelihood that a federal habeas court will repudiate an established state rule. But, as *Strickland v. Washington* made clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. at 2065.

*Smith*, 477 U.S. at 536. Such being the case, the mere fact that Wolfe's trial counsel failed to offer testimony through which he might have hoped to bring about the ruling that was eventually issued by the Wisconsin Supreme Court in *Head* cannot form the basis of an ineffective assistance of counsel claim under *Strickland*.

12

Wolfe's third claim of ineffective assistance of counsel is predicated on the assertion that trial counsel was ineffective for failing to present to the jury certain letters written by Carter, which letters showed Carter's aggressive and hostile nature. The Wisconsin Court of Appeals addressed this particular claim in the following fashion.

> Counsel was allegedly deficient for not seeking the admission of letters recovered from Carter's house or using those letters in cross-examination. The letters were authored by Carter to various people, including Wolfe, Carter's mother, the other inmate Carter bailed from jail and threatened, another inmate Carter offered to help, and Carter's daughter and neighbors. Some of the letters apparently used vile language and wished certain persons dead. The letters to Wolfe reflected how Carter became acquainted with Wolfe and the relationship he wanted to establish with him. Wolfe contends that the letters would have served to reflect Carter's moods and capacity for anger and threats.

> Counsel assessed the vast number of letters as inadmissible. This was an accurate assessment in that many of the "hate" letters were written more than a month before Carter's death and therefore not related to Carter's state of mind on the day of the stabbing or with regard to his relationship with Wolfe. Evidence was presented that Carter threatened another inmate with a knife when sex was rejected. Further, the evidence was that Wolfe was aware of that behavior. In contrast, there was no suggestion that Wolfe was aware of the numerous letters and their content such that it would have impacted on his interpretation of Carter's behavior the day of the stabbing. There was also some evidence that Carter had written threatening letters with vile language. The jury knew the information Wolfe contends the letters would have imparted. The letters would have served nothing more than prejudicial piling on of extraneous information. No legal basis for admission of the evidence has been advanced. Our confidence in the outcome is not undermined by counsel's failure to utilize the letters at trial.

(Resp's Ans., Ex. G, ¶¶ 11-12.)

To reiterate, federal courts may not grant habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). A state

Case 2:05-cv-00085-WEC   Filed 06/07/07   Page 13 of 25   Document 43

court decision is "contrary to" federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision results in an "unreasonable application" of clearly established federal law when the state court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407.

Wolfe has not cited any Supreme Court case in which the facts were materially indistinguishable from the facts in his case, but which was decided differently than the manner in which the state court decided his case. Thus, in order to be granted federal habeas corpus relief Wolfe must demonstrate that the Wisconsin Court of Appeals' rejection of his ineffective assistance of counsel claim based on his lawyer's not attempting to introduce all of letters found in Carter's residence was an unreasonable application of *Strickland*. In other words, the state court's decision must be found to be "well outside the boundaries of permissible differences of opinion." *Hardaway*, 302 F.3d at 762. Moreover, "the state-court decision must be both incorrect and unreasonable." *Woods*, 430 F.3d at 817.

Regardless of whether any or all of the letters would have admissible (i.e. regardless of when they were written or whether Wolfe was even aware of their existence) the ultimate question that must be answered is "how much evidence of the victim's violent proclivities is enough?" The state appellate court observed that "[t]he jury knew the information Wolfe contends the letters would have

14

imparted. The letters would have served nothing more than prejudicial piling on of extraneous information." (Resp's Ans, Ex. G, ¶¶ 11-12.) While this court might not have described the use of the letters as "prejudicial piling on," the fact remains that the jury heard a detailed first-hand account of the claimed violent proclivities of Carter.

Indeed, as the respondent recounts in his brief, Kris Borchardt testified that he met Carter in drug treatment at the Waukesha Huber facility. Carter suggested that Borchardt live with him in his condominium and Borchardt accepted. Borchardt lived with Carter for one week, and then moved out after Carter accused him of stealing from him. Shortly thereafter, Borchardt moved back in with Carter for a two-day period. When Carter accused Borchardt of stealing his car, Borcahrdt's probation was revoked and he was placed in the Waukesha County Jail where he met Wolfe. Borchardt told Wolfe about his experience living with Carter. Borchardt stated that Carter had told Borchardt that he wanted rent money from him. Borchardt explained to Carter that that had not been part of their agreement. Carter told Borchardt that he could pay rent by performing sexual acts with Carter. At this, Borchardt started laughing. Carter then grabbed a kitchen knife and said, "You know, I care about you a lot, and if I can't have you, no one is going to have you." Carter lunged at Borchardt with the knife, but Borchardt successfully fought him off.

Borchardt also testified that he received threatening letters from Carter while he was in jail. In his letters to Borchardt, Carter made statements such as, "I'm going to kill you" and "Die, motherfucker." Wolfe's attorney showed Borchardt a letter written to Borchardt that said, "Death by Viagra" and had a picture of a coffin on it with a penis hanging out of the coffin. Borchardt said that he turned the letters over to the Waukesha Sheriff's Department for prosecution.

15

To be sure, the additional letters which Wolfe claims should have been admitted might have provided further evidence that Carter was a man not reluctant to make general threats. But, the jury was allowed to hear by far the most relevant and precise evidence of Carter's "violent proclivities." Indeed, the jury heard from Borchardt who, like Wolfe, was a prisoner who had been bailed out by Carter; who, like Wolfe, moved in with Carter; who, like Wolfe, had been the target of Carter's sexual proposals; and who, like Wolfe, claimed to have been attacked by Carter while Carter was wielding a knife and yelling, "If I can't have you, no one else can."

That the jury was allowed to hear and consider Borchardt's testimony when rendering its decision on Wolfe's claim of self-defense persuades me that it did not amount to an unreasonable application of *Strickland* for the court of appeals' to conclude that "[its] confidence in the outcome [of the trial was] not undermined by counsel's failure to utilize the letters at trial." Such being the case, to the extent that Wolfe's habeas corpus petition is predicated on his assertion that trial counsel was ineffective for failing to introduce into evidence the various letters found at Carter's residence, Wolfe's petition will be denied.

## B.  Claim Predicated on Trial Court Error

Wolfe claims that the trial court committed error when it allowed Wolfe's trial counsel to withdraw his objection to the admissibility of a certain letter written by Carter without conducting of Wolfe himself an inquiry as to whether he was waiving his right of confrontation with respect thereto.  The letter had been written to three Waukesha County Circuit judges.  It was dated Wednesday, September 13, 2000.  The text of the letter reads follows.

> RE: Ronald Wolfe, Case 00CM1728 - $500, 00CM001725 - $500, 00CF496 - $2000
> & 00CF000572 - $200

16

I bailed Mr. Wolfe out of Waukesha County Jail the day following Labor Day. He has lived with me since that time as my domestic partner. Last night he arrived at my home after an apparently stressful day and demanded money to go buy cocaine along with a co-worker named Homer Walz. I refused vehemently. Use of cocaine is not consistent with the law and is not considered by me to warrant his remaining on release. It is my desire to revoke his bail, to have him returned to custody and to have the courts do whatever is considered to be apt at this time. Ron has additionally been verbally abusive of me and threatening. I fear for my safety as long as he is not in custody. He left and probably bought cocaine. I have not seen him since he left. He and Homer are not at work today as of the time of this memorandum and neither called into their boss that they were ill.

If I must attend a court hearing, it is important that it be known that I am relocating on September 26, 2000 500 miles south of Brookfield. It would be helpful if I could meet with each separate court on the same date. The new address and phone are as follows;

1808 Pine Street
Eldorado, Illinois 62930
Phone: [618] 273 - 9800

The court of appeals dealt with this claim in the following fashion.

The letter Carter wrote to the circuit court on September 13, 2000, seeking to have Wolfe's bond revoked was admitted into evidence. In a pretrial hearing, the defense objected to the admission of the letter and the trial court ruled that it would not be admitted unless some witness corroborated Wolfe's knowledge of the letter and that it was authored by Carter. At trial one witness testified that Carter told her he had written to the court and was afraid of Wolfe. Other witnesses verified that Carter said Wolfe was using cocaine, that Wolfe had stolen money from him, and that Carter had written letters to have Wolfe's bond revoked. Wolfe made a statement to a friend that Carter wanted to get Wolfe's bond revoked because Wolfe had stolen money from Carter and Carter was scared for his life. When the prosecution renewed its motion to admit the letter, the defense withdrew its objection.

Wolfe characterizes the withdrawal of his objection as a waiver of his constitutional right to confrontation. He argues that the trial court erred by not engaging in a colloquy with him to assure that the waiver was made personally and not merely by counsel. We disagree that such a colloquy was required.

Admission of the letter did not violate Wolfe's right to confrontation because it was not hearsay evidence. The letter was admissible for the purpose of showing Carter's state of mind and not for the truth of the matters asserted within the letter.

17

> See WIS. STAT. § 908.01(3) (2001-02). It was also admissible to show Wolfe's knowledge of the request that bond be revoked and consequently a motive for the murder. The truth of the matters contained in the letter was inconsequential. Thus, Wolfe's confrontation rights were not implicated and no personal waiver required.

(Resp's Ans, Ex. G, ¶¶ 15-17.)

To reiterate, in order to be granted federal habeas corpus relief a petitioner must demonstrate that the adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Wolfe argues that the trial court erred in not conducting a colloquy with him in order to ascertain whether Wolfe (as opposed to his lawyer) was waiving his Sixth Amendment right of confrontation in allowing Carter's letter to be admitted into evidence.

First of all, Wolfe has not cited any Supreme Court decision which he claims the trial court's decision was contrary to. To be sure, he cites *Taylor v. Illinois*, 484 U.S. 400 (1988) for the proposition that "[a]n attorney cannot waive a defendant's confrontation right 'without the fully informed and publically acknowledged consent of the client.' *Taylor v. Illinois*, 484 U.S. 400, 417-[4]18 (1988)." (Pet'r's Br. at 50.)[1] In *Taylor*, the Court noted those sorts of basic rights which cannot be waived by an attorney include a defendant's right to plead not guilty and to have a trial where he can confront and cross-examine adversary witnesses; the right to trial by jury; and the right to be present at trial. *Id*. at 418 n.24. However, nowhere in *Taylor* did the court say that a trial court must conduct a colloquy with a represented defendant to make sure that he agrees with his counsel's

---

[1] Wolfe failed to include in his quote the full sentence from *Taylor*. The full sentence reads as follows: "Although there are basic rights that the attorney cannot waive without the fully informed and publically acknowledged consent of the client, the lawyer has-and must have-full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." *Id*., at 417-18.

18

withdrawal of an objection to a document for which authentication and relevance had been satisfactorily established in compliance with the trial court's previous ruling.

Of course, Carter argues that the letter was hearsay and that its admission violated his Sixth Amendment right to confrontation. Such being the case, Wolfe maintains that his attorney's withdrawal of his objection to its admissibility was tantamount to surrendering Wolfe's right of confrontation. But, this argument depends for its efficacy on the proposition that the letter was a testimonial statement and therefore to admit it into evidence was a violation of Wolfe's Sixth Amendment right of confrontation.

In *Crawford v. Washington*, 541 U.S. 36 (2004) the Supreme Court ruled that, regardless of how "reliable" an out-of-court statement, i.e., hearsay, might be (and therefore regardless of whether it might be admissible under the rules of evidence applicable to the proceedings), its admissibility in accordance with the Constitution turns on the question of whether it is testimonial or nontestimonial in nature.

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does *[Ohio v.]Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with close kinship to the abuses at which the Confrontation Clause was directed.

*Crawford*, 541 U.S. at 68. Since its decision in *Crawford* was issued, the Supreme Court has had occasion to address further the question of what constitutes testimonial hearsay.

19

Specifically, in *Davis v. Washington*, 126 S.Ct. 2266 (2006), the Court held that the recording of a 911 telephone call during which questions were asked of the caller and answers were given thereto by the caller did not constitute testimonial hearsay. In reaching such a conclusion the Court emphasized that the circumstance of the telephonic "interrogation" was "to enable police assistance to meet an ongoing emergency. . . . [The caller] was not *testifying*. What she said was not a 'weaker substitute for live testimony' at trial." *Davis*, 126 S.Ct at 2277 (emphasis in original) (quoting *United States v. Inadi*, 475 U.S. 387, 394 (1986)).

The other case that was resolved in *Davis* was one which involved an interview by police of an alleged victim of domestic violence at her residence. In that case (involving a victim named Amy Hammon) the Court held that the interview did constitute testimonial hearsay. In contrast to the 911 caller who was relaying ongoing events to the 911 operator, the statements of Amy Hammon that were introduced were the product of an formal interview by police officers concerning past events. In comparing the statements made by Amy Hammon to those which were addressed in *Crawford*, the Court stated as follows.

> Both declarants were actively separated from the defendant-officers forcibly prevented Hershel [the defendant] from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Davis*, 126 S.Ct. at 2278 (emphasis in original.)

In my opinion, the letter sent by Carter to the three state court judges seeking to have Wolfe's bond revoked is more akin to the 911 call in *Davis* than to the statements made by Amy Hannon to the police during their interview of her. First of all, the statements made therein are not the product

20

of interrogation by anyone, much less interrogation by law enforcement officers. Secondly, although the letter might be construed to include some remarks concerning "potentially criminal past events," the obvious overriding purpose of the letter was to convey to the three judges Carter's state of mind, to wit, his genuine fear of Wolfe and his consequent desire to have Wolfe's bond revoked. In other words, Carter's letter was not testimonial hearsay, the admission of which implicated Wolfe's Sixth Amendment confrontation rights. Such being the case, the fact that the state trial judge did not conduct a colloquy with Wolfe personally to determine whether Wolfe wished to waive his right to object to the admission of such evidence is of no moment.

In any event, even if Carter's letter were considered to be testimonial hearsay, the Supreme Court recently held in *Whorton v. Bockting*, 127 S.Ct. 1173 (2007) that *Crawford* is not to be applied retroactively to cases already final on direct review. Such being the case, the Court's holding in *Crawford* would do Wolfe no good.

Instead, Wolfe's trial error claim would need to be examined under the Supreme Court's holding in *Ohio v. Roberts*, 448 U.S. 56 (1980).

> *Roberts* had held that the Confrontation Clause permitted the admission of a hearsay statement made by a declarant who was unavailable to testify if the statement bore sufficient indicia of reliability, either because the statement fell within a firmly rooted hearsay exception or because there were 'particularized guarantees of trustworthiness' relating to the statement in question.

*Whorton*, 127 S.Ct. at 1178 (quoting *Roberts*, 448 U.S. at 66). And when so examined, it is quite clear that Wolfe's claim must fail.

As previously noted, the trial court initially ruled the letter to be inadmissible. In so ruling, however, the court left open the possibility of the letter being admitted into evidence.

21

Now, should the state put forth witnesses who testify that the defendant knew that Mr. Carter was trying to have his bail changed, I think it puts it in a different light. Absent witness testimony concerning Mr. Wolfe's knowledge that Mr. Carter was trying to get his bail changed, due to the confrontation problems and the problems in terms of determining the veracity of this letter, the court is not going to allow this letter to be admitted.

Now, should there be a witness or witnesses who testify that Mr. Wolfe had knowledge concerning Mr. Carter attempting to change the bail situation, we will have to revisit this letter.

. . . .

But until such time as I hear testimony concerning Mr. Wolfe's knowledge that Mr. Carter was trying to get the bail money back – strike that. Was trying to get the bail situation changed, I'm not going to allow this letter in. If that comes in, then we'll deal with the issue of – you can renew your objections, Attorney Marquis, that it shouldn't come in based upon hearsay and confrontation, but I'm telling you at that point if I hear what is necessary, I think some redacted version or some information as it relates to this letter may into evidence.

(Resp's Ans., Ex. O, pp. 34-38.)

Simply stated, the State did present witnesses at the trial who addressed the trial court's concerns. Specifically, the State called Edith Chamberlain. She testified regarding her knowledge of the letter and Carter's comments that he was fearful of Wolfe. (Resp's Ans., Ex. U, pp. 90-130). The State called other witnesses who testified regarding the fact that, *inter alia*, Wolfe was out on bond and that he wrote a letter or letters to have Wolfe's bond revoked. The State thereafter renewed its motion to have the letter admitted. In so moving, the State argued as follows:

Another issue, your Honor, that I'd want to renew in front of the court is the motion to admit Carter's letter. We've had a number of witnesses testify to that now. I think virtually all the contents of the letter have been testified to by witnesses. There were some concerns by the court expressed earlier about the defendant's knowledge of the letter or the contents of the letter perhaps being prejudicial, but as I said, I think that bell has already been rung and we renew that motion.

22

(Resp's Ans, Ex. W, p. 570.)  Thereafter, with no objection from Wolfe's counsel, the court admitted the letter.

To reiterate, the court of appeals addressed the issue in the following fashion:

> Admission of the letter did not violate Wolfe's right to confrontation because it was not hearsay evidence.  The letter was admissible for the purpose of showing Carter's state of mind and not for the truth of the matters asserted within the letter.  See WIS. STAT. § 908.01(3) (2001-02).  It was also admissible to show Wolfe's knowledge of the request that bond be revoked and consequently a motive for the murder.  The truth of the matters contained in the letter was inconsequential.  Thus, Wolfe's confrontation rights were not implicated and no personal waiver required.

(Resp's Ans, Ex. G, ¶¶ 15-17.)

Although neither the trial court nor the court of appeals expressly relied on, or cited to, *Roberts*, it is my opinion that their respective rulings did not constitute unreasonable applications of *Roberts*.  To the contrary, the trial court's expressed concern was that there be other evidence to show what Mr. Wolfe knew and to support the "veracity of the letter" before it could be admitted.  Stated another way, the trial court was looking to find "particularized guarantees of trustworthiness" relating to such letter before it would be admitted.  Clearly, the trial court was satisfied there were such "particularized guarantees of trustworthiness" before it admitted the letter. That is all that *Roberts* required.  And, I certainly cannot find the trial court's ruling on the admissibility of the letter to be an unreasonable application of *Roberts*.

The court of appeals, on the other hand, found that the letter was, in any event, not hearsay because the matters set forth therein related to Carter's state of mind and the truth of the matters set forth therein was "inconsequential."  Once again, it is my opinion that such ruling could not be deemed to be an unreasonable application of the Supreme Court's ruling in *Roberts*.

23

Such being the case, to the extent that Wolfe's habeas corpus petition is predicated on his assertion that the trial court committed error when it allowed Wolfe's trial counsel to withdraw his objection to the admissibility of a certain letter written by Carter without conducting of Wolfe himself an inquiry as to whether he was waiving his right of confrontation with respect thereto, Wolfe's petition will be denied.

## IV.  WOLFE'S MOTION TO AMEND PETITION

There is one final matter to address.  On June 1, 2007, Wolfe filed a motion to amend his habeas corpus petition "to include a claim previously raised in the Wisconsin courts and during direct appeal, but not clearly in his Petition for Writ of Habeas Corpus."  Specifically, Wolfe seeks to have his petition amended to include a claim that counsel was ineffective for failing "to present supporting witness testimony from the decedent's family and friends supporting the defense."  (Mot. at 2.) Wolfe's motion will be denied.  Wolfe did not file his motion until long after briefing on the merits of the petitioner's claims had been completed.  Indeed, the last brief to be filed in this action was filed by the petitioner himself on November 6, 2006.  Simply stated, Wolfe unduly delayed the filing of his motion to amend.

**NOW THEREFORE IT IS ORDERED** that Wolfe's petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that Wolfe's motion to amend his petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

24

**SO ORDERED** this <u>7th</u> day of June 2007, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

25